## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

TYLER COLE THOMPSON,
Next of Kin of THOMAS COLE
THOMPSON, Deceased,

      Plaintiff,

v.

MATTHEW MERICLE, in his
individual capacity, and RONALD
DESTRY MUSGROVE, in his
individual capacity,

      Defendants.

Case No. 6:21-CV-00358-RAW

## MEMORANDUM AND ORDER

Before the Court is the motion of Defendants Matthew Mericle and Ronald Destry Musgrove for summary judgment. *See* Mot. Summ. J., ECF No. 50. Plaintiff[1] filed a response, and Defendants filed a reply. *See* Resp., ECF No. 62; Reply, ECF No. 65. Plaintiff brings claims pursuant to 42 U.S.C. § 1983 for alleged Fourth Amendment violations related to Defendants' alleged use of excessive force. Second Am. Compl., ECF No. 24. Specifically, the Second Amended Complaint alleges as to both Defendants (1) excessive force; (2) failure to intervene; (3) failure to render aid; and (4) wrongful death under Okla. Stat. tit. 12, § 12-1053. *See id.* at 10–12. Defendants have moved for

---

[1]     For clarity, because Plaintiff Tyler Cole Thompson shares the same last name as the decedent in this case, the Court will refer to him throughout this opinion as "Plaintiff" rather than "Mr. Thompson."

summary judgment primarily on the basis of qualified immunity.  *See* Mot. Summ. J. at 18.

For the following reasons, the Court **grants in part** Defendants' summary judgment motion, insofar as Defendants challenge Plaintiff's federal claims.  Having found all Plaintiff's federal claims to lack merit, however, the Court **declines to exercise supplemental jurisdiction** over Plaintiff's state-law wrongful death claim.  Accordingly, to the extent that Defendants' motion for summary judgment pertains to that state-law claim on the merits, the Court **denies the motion in part as moot**.

## I

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 756 (10th Cir. 2021) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).  "In applying this standard, we view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016)).

"In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  "More

specifically, where the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts, '[a]ll disputed facts must be resolved in favor of the party resisting summary judgment.'" *Id.* (alteration in original) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that [contradicted] version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. For example, "the general proposition that we accept plaintiff's version of the facts in the qualified-immunity summary-judgment setting 'is not true to the extent that there is *clear contrary* video evidence of the incident at issue.'" *Taylor*, 16 F.4th at 757 (quoting *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "When a § 1983 defendant asserts qualified immunity, this affirmative defense 'creates a presumption that [the defendant is] immune from suit.'" *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)).

3

"A plaintiff 'can overcome this presumption only by "show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right.""" *Taylor*, 16 F.4th at 757 (quoting *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 984 (10th Cir. 2020)). "The plaintiff must satisfy *both* prongs to overcome a qualified immunity defense, and we may exercise our discretion as to which prong to address first." *Id.* at 757–58 (emphasis added) (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020)).

Plaintiff alleges that Defendants' use of deadly force was excessive and thus violated the Fourth Amendment. *See* Second Am. Compl. at 10, ¶ 52. "We treat excessive force claims as seizures subject to the reasonableness requirement of the Fourth Amendment." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable. The '"reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

> Moreover, because '"police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."

*Id.* at 1259–60 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

4

"We assess objective reasonableness based on 'whether the totality of the circumstances justified the use of force,' and 'pay careful attention to the facts and circumstances of the particular case.'" *Id.* at 1260 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)). "Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Id.* (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)).

"Indeed, even '[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.'" *Id.* (quoting *Jiron*, 392 F.3d at 415). "A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'" *Id.* (quoting *People v. Morales*, 198 A.D.2d 129, 130 (N.Y. App. Div. 1993)).

"The proper application of qualified immunity in the Fourth Amendment context 'requires careful attention to the facts and circumstances of each particular case.'" *Taylor*, 16 F.4th at 762 (quoting *Graham*, 490 U.S. at 396). "In *Graham v. Connor* the Supreme Court provided three factors to help structure this inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Furthermore, in *Larsen*, the Tenth Circuit provided four "non-exclusive factors" that aid in "assessing the degree of threat facing officers." *Larsen*, 511 F.3d at 1260. "These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id.* "But in the end[,] the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.*; *see Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The four [*Larsen*] factors . . . are quite significant. But they are only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" (quoting *Larsen*, 511 F.3d at 1260)).

To show that officers' alleged conduct violated a constitutional right that was clearly established at the time of the conduct in question, a plaintiff must show that "there existed 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains.'" *Smart*, 951 F.3d at 1169 (quoting *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018)).

However, "the Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'" *Id.* at 1168 (quoting *Mullenix*, 577 U.S. at 12). "[S]pecificity is especially important in the Fourth Amendment context, where . . .

6

'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). "Nevertheless, our analysis is not a 'scavenger hunt for prior cases with precisely the same facts,' and 'a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law.'" *Id.* (first quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007); and then quoting *Halley*, 902 F.3d at 1149). "Rather, '"[t]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional."'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## II

With the above principles in mind, the Court now provides the factual background in the light most favorable to Plaintiff—except where Plaintiff's view of the facts is not supported by the record or blatantly contradicted by the objective video evidence—and also chronicles the procedural history of the case.

## A

On December 3, 2019, Defendant Matthew Mericle, a City of Ada, Oklahoma police officer, drove to the residence of decedent Thomas Cole Thompson to execute a felony arrest warrant for Mr. Thompson on charges of passing a forged check and false impersonation of another. *See* Mot. Summ. J., Ex. 1, ECF No. 50-1, at 2,[2] ¶¶ 1–5

---

[2]    Where the Court references a page number from one of the exhibits to the Motion for Summary Judgment, the Court will use the page number from the ECF

(Declaration of Officer Matthew Mericle); Mot. Summ. J., Ex. 3, ECF No. 50-3, at 2–3

(Probable Cause Affidavit for Thomas Cole Thompson Arrest Warrant).[3]

Officer Mericle arrived at the house and—with his body camera activated—

knocked on the front door. *See* Mot. Summ. J., Ex. 4, ECF No. 50-4, at 0:00–0:02

(Officer Mericle Body-Worn Camera Footage).  No one answered the door, and a short

time later Officer Mericle walked around the right side of the house to an open gate

leading into the backyard. *See id.* at 0:02–1:00.[4]  About a minute later, dogs started

barking in the area behind the house. *See id.* at 1:00–1:04.  Officer Mericle proceeded

through the open gate and into the backyard. *See id.* at 1:04–1:10.  After entering the

backyard, Officer Mericle saw Mr. Thompson and his wife, Kristina Thompson, in the

corner of the backyard. *See id.* at 1:10.  He whistled to get their attention and said, "both

of you." *Id.* at 1:10–1:11.

Ms. Thompson walked towards Officer Mericle and Mr. Thompson followed

behind her. *See id.* at 1:12–1:23.  Officer Mericle said, "you all tried to sneak out the

---

header.

[3]     Plaintiff highlights in his Statement of Additional Material Facts Precluding
Summary Judgment that Officer Mericle never advised Mr. Thompson that he had a
warrant for his arrest. *See* Resp. at 12, ¶ 1.  However, this fact is immaterial to Plaintiff's
claims.

[4]     Mr. Thompson's residence at 815 W. 12th St., and Mr. Thompson's
neighbor's residence at 819 W. 12th St., share a backyard with no fence or barrier
between them. *See* Mot. Summ. J., Ex. 7, ECF No. 50-7, at 2 (Photograph of Location);
*see also* Mot. Summ. J., Ex. 14, ECF No. 50-14, at 4 (OSBI Crime Scene Report) ("The
scene was located outdoors at 819 West 12th Street and 815 West 12th Street, Ada,
Pontotoc County, Oklahoma.  The residences were located next door to each other and
shared a backyard surrounded by a wooden privacy fence.").

back on me, didn't you? . . . The dogs gave you away." *Id.* at 1:24–1:37.  Mr. and Ms.

Thompson began explaining something and Officer Mericle said, "Time's up," to which

Mr. Thompson responded, "ok."  *Id.* at 1:30–1:47.  Officer Mericle then told Mr. and Ms.

Thompson, "let's go up front."  *Id.* at 1:48.  Mr. Thompson responded, "let's go."  *Id.* at

1:49.  Officer Mericle said, "why'd y'all try to run?  Come on."  *Id.* at 1:50–1:52.  Ms.

Thompson proceeded past Officer Mericle and toward the front yard.  *See id.* at 1:53–

1:54.  Officer Mericle then stated, "y'all walk in front of me, that way."  *Id.* at 1:55–1:56.

  At this point, the body camera footage depicts Officer Mericle screaming,

"goddamn no," while his body camera falls to the ground and goes off thereafter.  *Id.* at

1:57–2:00.  A woman (presumably Ms. Thompson) screams in the background, "no!"  *Id.*

at 1:58–1:59.  Regarding this moment, *Defendants assert*: "Mr. Thompson [] pulled out a

handgun from his waistband and pointed at Officer Mericle's face and said he was not

going back to prison.  Officer Mericle yelled out 'Oh goddamn no!' and he pushed the

gun to the side, [and] turned and started to scramble to the gate to try and find some

cover.  During this time Officer Mericle's body camera was knocked off of its holder and

fell to the ground and turned off."  Mot. Summ. J. at 4, ¶ 14 (citing Mot. Summ. J., Ex. 1,

at 3–4, ¶¶ 17–18).  But *Plaintiff responds*:

> The body camera footage does not show Mr. Thompson removing a
> handgun from [his] waistband and point[ing] it at Officer Mericle's
> face or contain audio of Mr. Thompson stating he was not going back
> to prison. . . . In her interview immediately following the incident
> Mrs. Thompson stated she first heard Officer Mericle scream and take
> off running then she heard Mr. Thompson say[,] "I'm not" and is
> unsure if he said I'm not going. . . . Mrs. Thompson stated Mr.
> Thompson was not pointing the gun at Officer Mericle at that

> time. . . . Mrs. Thomson denied Mr. Thompson said[,] "I'm not going
> back."

Resp. at 6, ¶ 14 (citing Mot. Summ. J., Ex. 12, ECF No. 50-12, at 24–25 (Transcript of

OSBI interview with Kristina Thompson)).

For the purposes of this motion, it is immaterial to the Court whether Mr.

Thompson made a statement regarding going back to prison, and the Court will not make

a finding of fact in that regard. However, the record is clear that Mr. Thompson did

display a handgun at this time, and the Court will accept that fact as true. In Plaintiff's

response in this paragraph, he disputes only that "[t]he body camera footage does not

*show* Mr. Thompson removing a handgun from [his] waistband and point[ing] it at

Officer Mericle's face." Resp. at 6, ¶ 14 (emphasis added). But—while true that the

body camera footage does not *show* this part of the encounter—this statement fails to

dispute that Mr. Thompson indeed *displayed* a handgun in some fashion at that time.

Moreover, to the extent Plaintiff *is* asserting that Mr. Thompson did not display a

handgun at this time (and not just that the body camera footage does not *show* that he

displayed a handgun at this time), that is not supported by the record. In her interview

with police after the incident, Ms. Thompson told officers that Mr. Thompson "pulled a

gun" at this point in the encounter. Mot. Summ. J., Ex. 12, at 21. Officer Mericle

declared the same. *See* Mot. Summ. J., Ex. 1, at 3, ¶ 17. And, Plaintiff cites no contrary

evidence supporting a version of the facts where Mr. Thompson did *not* display a

handgun at this time. *See* Resp. at 2, ¶ 14; *see also Thomson*, 584 F.3d at 1312

("[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a

plaintiff's version of the facts must find support in the record . . . ."). Therefore, the

Court accepts as true that Mr. Thompson pulled out a handgun at this time.

After Mr. Thompson displayed the gun, Officer Mericle scrambled to the other

side of the wooden privacy fence and ran towards a car. *See* Mot. Summ. J., Ex. 1, at 3–

4, ¶¶ 17–18. Officer Rich Eaker, who was Officer Mericle's backup, arrived at the scene.

*See* Mot. Summ. J., Ex. 5, ECF No. 50-5, at 2, ¶ 3 (Declaration of Officer Rich Eaker).

At some point, Officer Mericle returned to the fence line and there was an exchange of

gunfire initiated by Mr. Thompson. *See* Mot. Summ. J., Ex. 1, at 4, ¶¶ 20–23; Mot.

Summ. J., Ex. 12, at 22, 25.[5] Officer Mericle was hit in his bulletproof vest. *See* Mot.

Summ. J., Ex. 1, at 4, 6, ¶¶ 23, 40; Mot. Summ. J., Ex. 17, ECF No. 50-17, at 2 (OSBI

Photograph of Bullet Lodged in Officer Mericle's Bullet Proof Vest).[6] Mr. Thompson

---

[5]    The parties dispute a number of details about this portion of the encounter,
including whether Officer Mericle was armed with a gun from the beginning of the
encounter or initially had a taser and then retrieved his gun; and whether Officer Mericle
reentered the backyard because he saw Mr. Thompson fire at Ms. Thompson and was
trying to protect her. *See* Mot. Summ. J. at 11–12, ¶¶ 17, 20, 22; Resp. at 7–8, ¶¶ 17, 20,
22. However, these details are ultimately immaterial. What *is* material to the Court is
that there was an exchange of gunfire, and Plaintiff does not dispute that Mr. Thompson
initiated the gunfire.

[6]    Plaintiff disputes what exactly Officer Mericle said about being hit and
when he did so, although the evidence Plaintiff cites in support is an exchange between
Officer Mericle and Officer Collier, *see* Resp. at 9 ¶ 27, while Officer Mericle actually
claimed he made a remark to Officer Eaker, *see* Mot. Summ. J., Ex. 1, at 4, ¶ 26.
Regardless, Plaintiff does not dispute that Officer Mericle was indeed hit. *See* Resp. at 9,
¶ 27.

was located at the southeast corner of his neighbor's house next to his residence during this part of the encounter. *See* Mot. Summ. J., Ex. 1, at 4, ¶¶ 21, 23, 25.[7]

Officer Ryan Collier and Officer Ronald Destry Musgrove both responded to the scene from the police station after hearing an announcement of "shots fired" over the police radio. *See* Mot. Summ. J., Ex. 2, ECF No. 50-2, at 2, ¶ 2 (Declaration of Officer Ronald Destry Musgrove); Mot. Summ. J., Ex. 8, ECF No. 50-8, at 2, ¶ 2 (Declaration of Officer Ryan Collier). Once on the scene, Officer Collier proceeded to the gate area where Officers Mericle and Eaker were located and then turned on his body camera, while Officer Musgrove turned on his body camera and attempted to go around the other side of the house before returning to the porch at the front of the house. *See* Mot. Summ. J., Ex. 2, at 2, ¶ 3; Mot. Summ. J., Ex. 8, at 2, ¶¶ 3–4. Mr. Thompson then walked into the officers' view. *See* Mot. Summ. J., Ex. 5 at 2, ¶ 7. Officer Eaker activated his body camera upon seeing Mr. Thompson. *See id.*

This body camera footage picked up when Mr. Thompson was in between his house and his neighbor's house, on his knees with his hands in the air, apparently unarmed, and bloodied from the previous exchange of gunfire. *See* Mot. Summ. J., Ex.

---

[7]     To be clear, Plaintiff disputes that Mr. Thompson was at the southeast corner of the neighbor's house when he shot Officer Mericle. *See* Resp. at 4, ¶ 23. But for reasons that we explicate *infra* Section III.A.1, the Court cannot accept Plaintiff's assertion disputing this fact because record evidence not only does not support Plaintiff's view, it also affirmatively undercuts it.

10, ECF No. 50-10, at 0:40 (Digital Synchronized Body-Worn Camera Footage of

Officers Collier, Eaker, and Musgrove).[8]

The officers were standing at the fence gate with guns drawn. *See id.*[9] An officer

shouted, "put your hands on the ground!  Now!  Now!" *Id.* at 0:03–0:06.  Then, an

officer said, "ok, I don't know where the gun is.'" *Id.* at 0:10–0:11.  Officer Mericle

stated, "I felt something hit my chest.  I don't know what it was." *Id.* at 0:15–0:18.  The

officers started shouting commands again, yelling, "get on the fucking ground now," "lay

[sic][10] down on the ground," "get on the ground," and "lay down." *Id.* at 0:21–0:26.

---

[8]     Plaintiff cites to page 51 of Defendants' Exhibit 14 (i.e., OSBI Crime Scene Report) for the proposition that "Officer Mericle saw Mr. Thompson's 'jaw hanging from his face and blood pouring out of it.'" Resp. at 12, ¶ 3.  The Court notes that no page 51 of the OSBI Crime Scene Report is included in the record. *See generally* Mot. Summ. J., Ex. 14, at 1–9.  Nonetheless, this fact is immaterial to the resolution of Defendants' Motion to Dismiss, and the body camera footage showing Mr. Thompson bloodied on his knees speaks for itself.

Similarly, Plaintiff's Additional Fact #5—that "[a] substantial pool of blood was accumulated on the ground where Mr. Thompson had been kneeling," Resp. at 12, ¶ 5— is immaterial, and the body camera footage speaks for itself.

Further, Plaintiff again cites pages of the OSBI Crime Scene Report not in the record, *see* Resp. at 13 ¶¶ 8, 10, 12–13, but these facts are immaterial in light of the body camera footage of the incident.

[9]     To be clear, Plaintiff does not claim that any of the force used by law enforcement *before* this point in time was excessive. *See* Second Am. Compl. at 11, ¶ 58; Resp. at 18–19.

[10]     The Court acknowledges—in the context in which the words are used—the grammatical error of using "lay" instead of "lie" but to avoid unduly distracting from the substance of its analysis—except for this one time—the Court does not call out the error by the use of "[sic]" in quoted material.

While Mr. Thompson was off-camera, the officers then shouted, "no, don't you reach," "don't, don't do it," "don't you reach," and "don't do it." *Id.* at 0:26–0:29. Mr. Thompson reappeared on camera—on his knees with his hands behind his back—as an officer commanded, "let me see your hands." *Id.* at 0:30–0:31. Mr. Thompson showed the officers his hands as they repeatedly commanded him to get down on the ground, put his hands on the ground, and get on his belly. *See id.* at 0:32–1:20. Mr. Thompson did not comply and remained on his knees. *See id.* In the video, the police sirens stop blaring and the audio depicts Ms. Thompson pleading with Mr. Thompson to "no, no, please don't," and Mr. Thompson replied to her, "I'm not." *Id.* at 1:10–1:17.[11]

After failing to comply with the officers' repeated commands to lie down on the ground, Mr. Thompson stood all the way up and stretched his arms out to the side. *See id.* at 1:20–1:26. Officer Collier stated, "I'm going around this way," and proceeded through the open gate toward Mr. Thompson. *Id.* at 1:25–1:33.[12] As Officer Collier

---

[11]   Plaintiff asserts that "Mr. Thompson tries to respond to the officers when instructed to lay on the ground, but is unable to speak clearly due to a gunshot wound to his face." Resp. at 12, ¶ 4. However, this is not evident from the body camera footage. Indeed, Mr. Thompson responded clearly to Ms. Thompson, "I'm not," when she pleaded, "no, no, please don't," which undermines Plaintiff's assertion that Mr. Thompson was unable to speak clearly at this time. Mot. Summ. J., Ex. 10, at 1:10–1:17. In any event, this fact is immaterial to the resolution of the Motion for Summary Judgment.

[12]   Plaintiff avers that "Officer Collier approache[d] Mr. Thompson to take him into custody because he [wa]s able to observe that Mr. Thompson [wa]s severely wounded, disoriented and unarmed"; and that "Officer Collier's efforts to place an unarmed Mr. Thompson into custody without the use of deadly force were interrupted by Officer Musgrove firing into the southeast corner of the 819 residence." Resp. at 12, ¶¶ 6–7. But it does not matter whether these indeed were Officer Collier's subjective motivations because "[w]e do not consider an arresting officer's subjective intentions"

14

proceeded through the gate, Mr. Thompson began backing up toward the corner of his neighbor's house. *See id.* at 1:26–1:27. Multiple officers shouted, "watch him, watch him, watch him, watch him." *Id.* at 1:28–1:30. Another officer then shouted, "hey! Lay down!" *Id.* at 1:30–1:31.

Mr. Thompson disappeared behind the corner of his neighbor's house and an officer shouted, "he's got the gun right there! That's where he was shooting from!" *Id.* at 1:33–1:35. Officer Musgrove then fired one shot toward the corner of the neighbor's house. *See id.* at 1:36–1:37.[13] An officer yelled, "get over, get over, get over now," as Officers Musgrove and Collier retreated behind the fence. *Id.* at 1:38–1:40.

Officer Mericle stated, "I'm going around the other side," and another officer said, "ok," as Officer Mericle ran around the front of the neighbor's house to the other side of the backyard. *Id.* at 1:40–1:43. Meanwhile, Officer Musgrove held his position behind the fence and fired an additional shot. *See id.* at 1:46–1:48. The officers shouted additional commands for Mr. Thompson to lie down on the ground, which were not heeded. *See id.* at 1:49–1:52.

---

when conducting an objective reasonableness analysis under the Fourth Amendment. *Cronick v. Pryor*, 99 F.4th 1262, 1270 (10th Cir. 2024). Moreover, to the extent Plaintiff highlights Officer Collier's actions to imply that his conduct was one of an objectively reasonable officer on the scene—whereas Officer Musgrove's conduct was not—whether one officer's conduct during an interaction was objectively reasonable is "largely irrelevant" to the question of whether another officer's conduct was objectively reasonable. *See Taylor*, 16 F.4th at 769; *see also infra* note 17.

[13]   Plaintiff avers that "Officer Musgrove calibrate[d] the scope giving him an enhance[d] view of Mr. Thompson and his position before firing at him." Resp. at 13, ¶ 9. This fact is immaterial.

Then, within seconds of each other, Officer Musgrove fired approximately 3 additional shots toward the corner of the neighbor's house while Officer Mericle fired several rounds in the same direction from his position at the other side of the fence. *See id.* at 1:54–1:58. In the video, Mr. Thompson's body can be seen falling to the ground. *See* Mot. Summ. J., Ex. 9, ECF No. 50-9, at 1:58–2:00 (Officer Collier Body-Worn Camera Footage). No more shots were fired, and an officer announced, "he's down, suspect down." *Id.* at 2:04–2:05.

Once the site was secured, medical personnel with Fire Rescue and EMS responded to the scene. *See id.* at 10:04–10:55. Mr. Thompson was pronounced dead at the scene. *See* Mot. Summ. J., Ex. 14, ECF No. 50-14, at 5 (OSBI Crime Scene Report). A Keltec .22 handgun with one live round in the chamber and one magazine with 21 rounds was found near Mr. Thompson's body in the backyard. *See id.* at 6; Mot. Summ. J., Ex. 9, at 3:35–3:39. Four .22 shell casings were also found. *See* Mot. Summ. J., Ex. 14, at 6.

## B

On July 11, 2022, Plaintiff Tyler Cole Thompson, the next of kin of decedent Thomas Cole Thompson, filed the operative Second Amended Complaint ("SAC") against Ada County Police Department Officer Matthew Mericle, Ada County Police Department Officer Ronald Destry Musgrove, and the City of Ada. *See* Second Am. Compl. at 1. In Count I, Plaintiff alleged Fourth Amendment Violations against Officers Mericle and Musgrove pursuant to 42 U.S.C. § 1983 for unlawful search and seizure and

the use of excessive force—including failure to intervene and failure to render aid.  *See id.* at 10–12.  In Count II, Plaintiff alleged *Monell* Liability against the City of Ada pursuant to 42 U.S.C. § 1983.  *See id.* at 12–16.  And in Count III, Plaintiff alleged *Canton* liability pursuant to 42 U.S.C. § 1983.  *See id.* at 16–17.  Notably, in each of the counts, Plaintiff also alleged that the conduct described amounted to wrongful acts and omissions under Okla. Stat. tit. 12, § 12-1053 (a wrongful death statute).  *See id.* at 12, 15, 17, ¶¶ 69, 90, 102.

On March 1, 2023, the Court granted in part and denied in part Defendants' partial motion to dismiss.  *See* Mem. and Order, ECF No. 38, at 1.  Specifically, the Court granted the officers' motion to dismiss Plaintiff's claim for unlawful search and seizure; denied the officers' attempt to eliminate punitive damages for the excessive force claim; and granted the City of Ada's motion to dismiss Plaintiff's *Monell* and *Canton* liability claims.  *See id.* at 13.

Therefore, the only claims remaining are Plaintiff's excessive force claim against Officers Mericle and Musgrove, Plaintiff's claim for failure to intervene, Plaintiff's claim for failure to render aid, and the state-law wrongful death claim.

On November 27, 2023, Officers Mericle and Musgrove moved for summary judgment in full. *See* Mot. Summ. J. at 1. Specifically, they bring the following arguments:

1. That they are entitled to qualified immunity.

   a. Defendants' use of force was reasonable under the circumstances and therefore did not violate Mr. Thompson's constitutional rights;

   b. Defendants did not fail to intervene;

   c. Defendants did not fail to render aid;

   d. Defendants did not violate clearly established law; and

   e. Defendants did not proximately cause Mr. Thompson's death.

2. That Plaintiff's wrongful death claim under Okla. Stat. tit. 12, § 1053 fails as a matter of law.

*See id.* at 20, 29–32.

On January 31, 2024, Plaintiff filed a response in opposition to Defendants' motion for summary judgment, and on February 14, 2024, Defendants filed a reply. *See* Resp. at 1; Reply at 1. On February 22, 2024, the motion was referred to the undersigned. *See* ECF No. 66.

### III

The Court will grant Defendants' Motion for Summary Judgment because Officer Mericle and Officer Musgrove are entitled to qualified immunity. First, Plaintiff has failed to show that Defendants violated a clearly established constitutional right of Mr.

Thompson on his excessive force claim. Second, Plaintiff has also failed to show that Defendants violated a clearly established constitutional right of Mr. Thompson on his failure to intervene claim. Third, Plaintiff did not respond to Defendants' assertion of qualified immunity on his failure to render aid claim, and therefore, the Court deems that claim to be abandoned or waived. Lastly, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law wrongful death claim.

### A

The Court will grant summary judgment to Defendants on Plaintiff's claim that Officers Mericle and Musgrove used excessive force in violation of the Fourth Amendment. Plaintiff has failed to show that Defendants violated a clearly established constitutional right of Mr. Thompson because (1) Defendants' use of force was objectively reasonable under the circumstances, and thus constitutional, and (2) even if it was not, Plaintiff has failed to establish that Defendants' conduct contravened clearly established law.

### 1

### a

Plaintiff advances two bases to find that Officer Mericle and Officer Musgrove used excessive force. First, he asserts that "Officers Mericle and Musgrove used excessive force in violation of clearly established law by shooting Mr. Thompson while he was unarmed." Resp. at 18. Second, Plaintiff asserts that "Officers Mericle and Musgrove used excessive force in violation of clearly established law by shooting Mr. Thompson when it was apparent he was seriously injured, disoriented and posed no threat." *Id.* at 19.

However, in assessing objective reasonableness, the Court must "pay careful attention to the facts and circumstances of the particular case," and, in this case, the Court is unable to share Plaintiff's view of the facts. *Larsen*, 511 F.3d at 1260 (quoting *Sevier*, 60 F.3d at 699). In particular, even taking the facts in the light most favorable to Plaintiff, the record does not support assertions that Mr. Thompson was unarmed, seriously injured, disoriented, or that he posed no threat at the time of the use of deadly force to Officers Mericle and Musgrove.

In the body camera footage, there is a period of time where Mr. Thompson was on his knees with his hands in the air, apparently unarmed, and bloodied. *See* Mot. Summ. J., Ex. 10, at 0:00–1:20. But Mr. Thompson was making movements with his arms and speaking clearly to Ms. Thompson; a reasonable officer likely would not have concluded that Mr. Thompson was "disoriented" or incapacitated. *See* Resp. at 19. What's more, Mr. Thompson—disregarding the officers' multiple commands to lie down on the ground—then stood fully upright and walked without apparent difficulty to hide behind the corner of his neighbor's house. *See id.* at 1:21–1:34. Thus, the objective video evidence "blatantly contradict[s]" an assertion that Mr. Thompson was "seriously injured" or "disoriented" when Officer Mericle and Officer Musgrove shot him, so the Court cannot "adopt that version of the facts." *Scott*, 550 U.S. at 380.

The Court also cannot accept Plaintiff's assertion that Mr. Thompson was unarmed or posing no threat at the time Officer Mericle and Officer Musgrove shot him. While Mr. Thompson was apparently unarmed in the moments before he moved behind

the corner of the neighbor's house, the video does not show whether he was armed or unarmed *after* he moved behind the corner, which is when Officer Mericle and Officer Musgrove shot at him. *See* Mot. Summ. J., Ex. 10, at 1:34–2:00. But Plaintiff does not adequately refute—with citation to record evidence that supports his assertion, *see Thomson*, 584 F.3d at 1312—the factual proposition that the corner of the 819 residence was Mr. Thompson's prior shooting location or that Mr. Thompson had firearms and ammunition at that location.

In particular, Officer Mericle declared that, when Mr. Thompson shot him in his bulletproof vest earlier in the encounter, Mr. Thompson's shooting location was the corner of the 819 residence. *See* Mot. Summ. J., Ex. 1, at 4, ¶ 23. Plaintiff points only to the OSBI Crime Scene Report to try to refute this assertion, but the Report supports a conclusion that Mr. Thompson had firearms and ammunition near the corner of the 819 residence. *See* Resp. at 11, ¶¶ 47–48.

The report states: "A Keltec .22 handgun with one live round in the chamber with one magazine with 21 rounds [] was located near the body in the backyard. Four .22 shell casings were found []." Mot. Summ. J., Ex. 14, at 6. As Defendants have noted, the shell casings' inclusion in the paragraph that lists what items were located near the body "indicates *the shell casings were near the body*." Reply at 4, ¶ 23. Separately, the OSBI Report also indicates that "a .22 live round [was located] near the southeast corner of 819 West 12th Street." *Id.* at 8. Moreover, the body camera footage depicts the recovery of Mr. Thompson's gun, which is right next to Mr. Thompson and the corner of the 819

21

residence. *See* Mot. Summ. J., Ex. 9, at 3:35–3:39. Therefore, the record does not

support Plaintiff's assertion that Mr. Thompson was unarmed when he was fatally shot.

*See Thomson*, 584 F.3d at 1312.

**b**

Instead, the *Graham* and *Larsen* factors indicate that, under the circumstances

present here, Officer Mericle's and Officer Musgrove's use of force was objectively

reasonable.[14]  The first *Graham* factor considers the "severity of the crime at issue."

*Taylor*, 16 F.4th at 762.  "[T]he first Graham factor weighs against the plaintiff when the

crime at issue is a felony, irrespective of whether that felony is violent or nonviolent."

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).  Here, the arrest

warrant for Mr. Thompson was for felony offenses. *See* Mot. Summ. J., Ex. 3, at 2; Okla.

Stat. tit. 21, § 21-1531; Okla. Stat. tit. 21, § 21-1577.[15]  Therefore, the first *Graham*

factor weighs against Plaintiff.

The second *Graham* factor, "whether the suspect poses an immediate threat to the

safety of the officers or others," is "undoubtedly the *most important* . . . factor in

determining the objective reasonableness of an officer's use of force." *Taylor*, 16 F.4th

---

[14]     Notably, Plaintiff's briefing is materially deficient in that it does not apply
either the *Graham* or the *Larsen* factors to the facts of this case —even though it is
beyond peradventure that, in this circuit, those two cases establish the legal framework
for assessing his excessive force claim.  Nevertheless, the Court applies the proper legal
framework in considering the merits of Plaintiff's claim.

[15]     Defendants highlight that Mr. Thompson had obviously also engaged in
felonious behavior earlier in the encounter when he shot Officer Mericle.  *See* Reply at
15.

at 762–63 (quoting *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1060–61 (10th Cir. 2020)).  "Though we must consider the totality of the circumstances, *Estate of Larsen* lists four factors designed to assist us in evaluating the degree of threat perceived by an officer." *Id.* at 765.  And while the reasonableness of the use of force depends on whether the officers were in danger at the *precise moment* that they used force, *see id.* at 761, "[t]he totality of the circumstances includes application of the *Graham* and *Estate of Larsen* factors to the *full encounter*, from its inception through the moment the officers employed force," *id.* at 765 (quoting *Bond*, 981 F.3d at 818).

The first *Larsen* factor considers "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands." *Larsen*, 511 F.3d at 1260.  The body camera footage here indisputably shows that Mr. Thompson refused to follow the officers' repeated commands for him to lie down on the ground immediately before Officers Mericle and Musgrove used deadly force.  Instead, Mr. Thompson stood up and hid behind the corner of the neighbor's house.  Therefore, the first *Larsen* factor weighs against Plaintiff.

The second *Larsen* factor considers "whether any hostile motions were made with the weapon towards the officers." *Larsen*, 511 F.3d at 1260.  By the time of the officers' use of deadly force, Mr. Thompson had already shot one of them with his weapon and hit him in his bulletproof vest.  Mr. Thompson had also returned to the location where he had previously done the shooting.  And his weapon was indeed located there.  To be sure, Mr. Thompson was concealed in the moments before the deadly shooting, so it is not known

whether he was holding or pointing a gun at the officers. But he had certainly made many hostile motions toward the officers throughout the totality of the encounter. Therefore, the Court determines that the second *Larsen* factor weighs against Plaintiff.[16]

The third *Larsen* factor considers "the distance separating the officers and the suspect." *Larsen*, 511 F.3d at 1260. When Officer Musgrove fired his gun, he was approximately 32 feet from Mr. Thompson. *See* Mot. Summ. J., Ex. 18, ECF No. 50-18, at 2 (Google Earth Photo of 815 and 819 W. 12th Street Ada, OK, With Approximate Measurements). And Officer Mericle was approximately 42 feet from Mr. Thompson when he fired his weapon. *See id.*

The Tenth Circuit "ha[s] never laid down a *per se* rule regarding distance." *Zia Trust Co. ex. rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010). However, "[i]n *Larsen*, [the Tenth Circuit] found that a distance between 7 and 20 feet heightened the immediacy of the danger and supported a finding of objective reasonableness of the use of deadly force." *Palacios v. Fortuna*, 61 F.4th 1248, 1260 (10th Cir. 2023) (citing *Larsen*, 511 F.3d at 1260–61). And "[the Tenth Circuit] in *Taylor* found that a distance of 10 to 20 feet, particularly where the officer was exposed and lacked cover, supported

---

[16]  Plaintiff points to the fact that certain Native American law enforcement officers who also were present at the shooting scene—specifically, Lighthorse Officers Tyler Sadler and Reece Lewis—did not fire their weapons. According to Plaintiff, this fact supports the inference that no officers—other than Officers Mericle and Musgrove— "perceived any immediate threat from Mr. Thompson sufficient to warrant use of deadly force." Resp. at 18. But whether other officers fired their weapons or not is "largely irrelevant" to the question of whether it was *objectively* reasonable for Officer Mericle and Officer Musgrove to fire their weapons. *Taylor*, 16 F.4th at 769 (citing *Valverde*, 967 F.3d at 1065). As such, the Court does not consider this point further.

the objective reasonableness of deadly force." *Id.* (citing *Taylor*, 16 F.4th at 769–70); *see also Palacios*, 61 F.4th at 1260 ("Here, the videos show that [the officers] were close to [the decedent] when they opened fire and each testified that the distance was about 15 to 20 feet. The officers were without cover, while [decedent] was headed in the direction of the storage facility which had more cover.").

Yet because the Tenth Circuit has not laid down a bright-line rule regarding separation distance that would circumscribe the inquiry under the third *Larsen* factor, even some greater distances than the Tenth Circuit has previously found to weigh against the plaintiff—in *Larsen*, *Taylor*, and other cases—might still weigh against the plaintiff under the totality of the circumstances of a particular case. Stated otherwise, because the Tenth Circuit has thus far declined to set a maximum separation distance under the third *Larsen* factor that would allow for a conclusion that this factor weighs against the plaintiff, a court may determine—under the totality of the circumstances in a given case—that the third *Larsen* factor weighs against the plaintiff, even though the separation distance is greater than the Tenth Circuit previously has concluded supports this outcome.

This result seems both logical and realistic to the Court. *Cf. Larsen*, 511 F.3d at 1260 ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'" *Id.* (quoting *Morales*, 198 A.D.2d at 130)); *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (rebuffing the plaintiff's argument about the trial court's exclusion of an affidavit bearing on the distance between the officers and the decedent, by noting that

"[t]he only change the affidavit would make is to place [the decedent] some twenty feet
farther away from the officers. An assailant can close that distance in a second or two.
There is no rule that officers must wait until a suspect is literally within striking range,
risking their own and others' lives, before resorting to deadly force."). And in that
regard, while the separation distance here may have been greater than in key Tenth
Circuit cases, the Court nevertheless determines that this factor weighs against Plaintiff—
even if only moderately so.

Notably, Officers Mericle and Musgrove were located only slightly farther away
from Mr. Thompson than the officers in *Larsen* and *Taylor*. And it bears noting that
Officers Mericle and Musgrove only had the wooden privacy fence as some amount of
cover between them and Mr. Thompson; that cover provided nowhere near the level of
protection as, for example, the rock wall did in *Pauly v. White*. *See* 874 F.3d 1197, 1218
(10th Cir. 2017) (ruling that the *Larsen* distance factor weighed *in favor* of the plaintiff
when the officer was located "fifty feet away from Samuel Pauly" and "sequestered
behind a rock wall."). In sum, the Court concludes that, notwithstanding that the
separation distance here was greater than found in some key Tenth Circuit cases, viewing
the evidence in the totality, the Court determines that the third *Larsen* factor weighs
against Plaintiff, even if only moderately so.

Finally, the fourth *Larsen* factor considers "the manifest intentions of the suspect."
*Larsen*, 511 F.3d at 1260. By the time Officers Mericle and Musgrove fatally shot Mr.
Thompson, Mr. Thompson had attempted to evade custody by going over the backyard

fence; shot at and hit Officer Mericle; refused to submit to custody by heeding the officers' instructions to lie on the ground; *and* walked away and concealed himself from the officers in his previous shooting location.  From these actions, a reasonable officer could understand that Mr. Thompson's manifest intentions were "hostile" and "violent." *Palacios*, 61 F.4th at 1260, 1262; *accord Arnold v. City of Olathe*, 35 F.4th 778, 792 (10th Cir. 2022); *Flores v. Henderson*, 101 F.4th 1185, 1194 (10th Cir. 2024); *see also Taylor*, 16 F.4th at 771.  Therefore, the fourth *Larsen* factor weighs against Plaintiff.

Because all of the *Larsen* factors weigh (in varying degrees) against Plaintiff, and given the totality of the circumstances of the entire encounter with Mr. Thompson, the Court determines that a reasonable officer could well have believed that Mr. Thompson posed an immediate threat to the safety of the officers at the time Officers Mericle and Musgrove used deadly force.  Therefore, the second *Graham* factor weighs against Plaintiff.

The third *Graham* factor considers "whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Taylor*, 16 F.4th at 762.  "[W]hen evaluating the third factor we consider whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged used of force." *Vette*, 989 F.3d at 1171.  Here, Mr. Thompson walked away from the officers—who were commanding him to lie on the ground—immediately before Officers Mericle and Musgrove used deadly force.  Therefore, the objective video evidence shows that Mr. Thompson was resisting arrest and/or attempting to evade arrest by flight at the precise moment the officers

employed the challenged used of force. As such, the third *Graham* factor also weighs against Plaintiff.

In conclusion, under the circumstances present here, it was objectively reasonable within the meaning of the Fourth Amendment for Officer Mericle and Officer Musgrove to use deadly force. To be sure, Plaintiff alleges facts—such as the shooting of an incapacitated, clearly unarmed, and non-threatening suspect—that might *theoretically* point toward a constitutional violation. But Plaintiff's allegations in this regard either find no support in the record or are blatantly contradicted by it. And under the *actual* facts that are supported by the record—including the objective video evidence—the decisions of Officer Mericle and Officer Musgrove to use deadly force were objectively reasonable. As such, Plaintiff has not shown that Defendants committed a Fourth Amendment violation by using excessive force against Mr. Thompson. The Court's determination in this regard constitutes an independent and sufficient basis for granting judgment in Defendants' favor as to their defense of qualified immunity as to Plaintiff's Fourth Amendment excessive force claim.

### 2

However, Plaintiff has also failed to show that any alleged constitutional violation was clearly established under the circumstances present here.

First, Plaintiff contends that *King v. Hill*, 615 F. App'x 470, 472, 476 (10th Cir. 2015), clearly established that it was unconstitutional to shoot Mr. Thompson while he was unarmed. *See* Resp. at 19. The Court rejects this argument for two reasons. First, a

28

single unpublished Tenth Circuit Order and Judgment does not suffice to show clearly established law. *See Surat v. Klamser*, 52 F.4th 1261, 1279 (10th Cir. 2022) ("[W]e have repeatedly explained that clearly established law may not be based on our unpublished decisions."); *see also Williams v. Hansen*, 5 F.4th 1129, 1133–34 (10th Cir. 2021). Second, *King* is factually inapposite because it involved "an unarmed man who did not pose any actual threat to the officer or to others" and—as explained *supra*—the record does not support a finding that Mr. Thompson was unarmed or non-threatening at the time he was fatally shot. *Cf. King*, 615 F. App'x at 479.

Second, Plaintiff contends that *Fancher v. Barrientos*, 723 F.3d 1191, 1195 (10th Cir. 2013) clearly established that it was unconstitutional to shoot Mr. Thompson while he was incapacitated. *See* Resp. at 20–21. The Court also rejects this argument— following a similar reasoning to that it employs in rejecting Plaintiff's reliance on *King*. The objective video evidence shows that a reasonable officer would not have concluded that Mr. Thompson was incapacitated at the time Officers Mericle and Musgrove used deadly force against him. In *Fancher*, the officer "fired six shots into a suspect who was 'no longer able to control [his] vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, [the] Deputy [], or other responding officers.'" *Fancher*, 723 F.3d at 1201. But here, Mr. Thompson was speaking clearly, able to move even when he was on his knees, and then able to walk away from the officers and conceal himself behind the 819 residence when the officers commanded him to get on the ground. Therefore, the record does not support a finding that Mr. Thompson

was incapacitated, unable to escape, or unable to shoot a gun. As such, *Fancher* is factually inapposite.[17]

In conclusion, even if Plaintiff were able to establish that Defendants violated Mr. Thompson's Fourth Amendment rights by using excessive force (which he cannot), the Court would still determine that he has not carried his qualified-immunity burden because he has not demonstrated that Defendants violated clearly established law. That is because Plaintiff's version of some of the key facts either finds no support in the record or is blatantly contradicted by it. And so the cases that Plaintiff cites as clearly established law—predicated on his mistaken version of those key facts—are inapposite and cannot lend him succor. Accordingly, the Court concludes that—on this independent and sufficient ground of lack of clearly established law—Plaintiff has not carried his qualified-immunity burden, and Officers Mericle and Musgrove are entitled to a favorable judgment on their defense of qualified immunity as to Plaintiff's Fourth Amendment excessive force claim.

---

[17]    Plaintiff also includes a string cite to *Perea*, 817 F.3d at 1204; *McCoy*, 887 F.3d at 1050 n.19; *Herrera v. Bernalillo Cty. Bd. of Cty Comm'rs*, 361 F. App'x 924, 929 (10th Cir. 2010); *Gouskos v. Griffith*, 122 F. App'x 965, 977 (10th Cir. 2005); and *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991). *See* Resp. at 20–21. These cases are similarly inapposite because they involve situations where the suspect was actually subdued or posing no threat at the time officers used allegedly excessive force. *See, e.g., Perea*, 817 F.3d at 1201 (involving a situation where officers continued to taser an individual after they already subdued him); *McCoy*, 887 F.3d at 1042 (considering a scenario where officers struck an individual more than 10 times *after* he already was handcuffed and zip-tied).

**B**

Plaintiff also fails to show that Defendants violated a clearly established

constitutional right of Mr. Thompson by failing to intervene. Plaintiff asserts:

> Officer Mericle was present at the gate and within a few feet of Officer
> Musgrove when he fired at the unarmed and wounded Mr. Thompson.
> Officer Mericle had sufficient time to intercede and prevent Officer
> Musgrove from continuing to shoot at Mr. Thompson but he made no effort
> to intervene or stop Officer Musgrove's excessive use of force. Instead,
> Officer Mericle moved away from Officer[] Musgrove and began to use
> excessive force himself towards Mr. Thompson. Thus when the evidence is
> viewed in a light most favorable to the Plaintiff a reasonable jury could
> conclude Officer Mericle failed to intervene and is liable for the excessive
> force used by Officer Musgrove.

Resp. at 22 (citation omitted).

Significantly, this paragraph does *not* include an allegation that *Officer Musgrove*

failed to intervene to prevent Officer Mericle's use of force. Therefore, the Court will

consider any challenge to Officer Musgrove's assertion of qualified immunity on this

claim waived.

Furthermore, because the Court has established *supra* that Officer Musgrove did

not violate Mr. Thompson's Fourth Amendment rights because the force used was

objectively reasonable, Officer Mericle cannot be held liable for failing to intervene to

prevent Officer Musgrove's *lawful* use of force. *See Flores v. Henderson*, 101 F.4th

1185, 1199 (10th Cir. 2024) (granting qualified immunity to the officers on the plaintiff's

failure to intervene claim after finding no constitutional violation occurred because "for

there to be a 'failure to intervene, it logically follows that there must exist an underlying

[clearly established] constitutional violation.'" (alteration in original) (quoting *Jones v.*

31

*Norton*, 809 F.3d 564, 576 (10th Cir. 2015))).  Moreover, Plaintiff fails to point to any

law clearly establishing a failure to intervene constitutional violation in these factual

circumstances and so he has not met his independent burden in that regard.  As such,

Officers Mericle and Musgrove are entitled to qualified immunity on Plaintiff's failure to

intervene claim.

C

Defendants also move for summary judgment on Plaintiff's failure to render aid

claim, to the extent he asserts one.  *See* Mot. Summ. J. at 29–30.  As Defendants correctly

note, Plaintiff "only mentions this allegation in the factual background section of the

Second Amended Complaint."  *Id.* at 29.  And Plaintiff fails to respond to Defendants'

motion for summary judgment on this claim.  In light of Plaintiff's inaction, Defendants

urge the Court to deem Plaintiff's claim "conceded for failure to respond."  Reply at 17.

To the same end, the Court determines that Plaintiff has abandoned or waived this

claim.  *See Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001) ("The

district court concluded Mr. Hinsdale abandoned his equal protection claim by failing to

address it in his response to defendants' motion for summary judgment. . . .  [W]e affirm

the district court's decision to grant summary judgment for defendants on Mr. Hinsdale's

equal protection claim." (citation omitted)); *Shoals v. City of Morris*, No. CIV-22-266-

RAW-GLJ, 2023 WL 10553149, at *10 (E.D. Okla. Dec. 4, 2023) (unpublished) ("As

Plaintiff has neither substantively responded to Defendant's arguments nor provided any

evidence for which a juror could find retaliation based on her injury, Defendant is entitled

32

to summary judgment based on waiver."), *report and recommendation adopted*, No. CIV-22-266-RAW-GLJ, 2024 WL 1312453 (E.D. Okla. Mar. 27, 2024); *see also Stephens v. BMAG Mgmt. Co., LLC*, No. CIV-20-00306-JD, 2023 WL 5538304, at *12 (W.D. Okla. Aug. 28, 2023) (unpublished) (ruling that the plaintiff "has abandoned her failure to promote claim" because "she provides no evidence or discussion regarding this claim in her response brief").  Furthermore, also leading to the same outcome, the Court observes that, because on summary judgment it is Plaintiff's burden to overcome Defendants' assertion of qualified immunity, it ineluctably follows that by failing to respond in his brief, Plaintiff has failed to meet his burden of establishing a constitutional violation or showing clearly established law.

Accordingly, Defendants are entitled to summary judgment as to Plaintiff's failure to render aid claim.[18]

---

[18]    Parenthetically, the Court notes that it is unclear in any event whether the Tenth Circuit even recognizes failure to render aid claims in circumstances such as these. *See Crittenden v. City of Tahlequah*, 786 F. App'x 795, 804 (10th Cir. 2019) ("Ultimately, whether officers have a duty to provide medical care in circumstances like those in the instant case [involving a failure to render aid after an officer-involved shooting] remains an open question in this circuit post-*Meeks*." (citing *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995))).  And even assuming that the Tenth Circuit did recognize it, a claim for failure to render aid almost certainly would need to be brought under the Fourteenth Amendment, *see id.* at 802—not the Fourth Amendment, as Plaintiff alleged in his Second Amended Complaint.  *See, e.g.*, *Cheeks v. Belmar*, 80 F.4th 872, 876 (8th Cir. 2023) (recognizing a failure to render aid claim and analyzing it under "a deliberate indifference standard").

**D**

Because the Court will grant summary judgment to Defendants on all of Plaintiff's claims brought under federal law, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state wrongful death claim.  "Section 1367(c) enables a federal district court to forgo exercising supplemental jurisdiction over a related state law claim if 'the district court has dismissed all claims over which it has original jurisdiction.'"  *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1314 (10th Cir. 2021) (quoting 28 U.S.C. § 1367(c)(3)).  "When all federal claims have been dismissed, the court may, and *usually should*, decline to exercise jurisdiction over any remaining state claims." *Id.* (emphasis added) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011)).  Consequently, having determined that Defendants are entitled to judgment on their favor on all of the remaining federal claims in this action, the Court concludes that it is prudent—and in line with, *inter alia*, considerations of comity and convenience—to decline to exercise supplemental jurisdiction over Plaintiff's state-law wrongful death claim.

**IV**

For the foregoing reasons, the Court **grants in part** Defendant's summary judgment motion (ECF No. 50), insofar as Defendants challenge Plaintiff's federal claims.  Having found all Plaintiff's remaining federal claims to lack merit, the Court **declines to exercise supplemental jurisdiction** over Plaintiff's state-law wrongful death

34

claim.  Accordingly, to the extent that Defendants' motion for summary judgment attacks

that state-law claim on the merits, the Court **denies the motion in part as moot**.

   **IT IS SO ORDERED.**


Dated this 20th day of August 2024.

_Jerome A. Holmes_
_____
JEROME A. HOLMES
CHIEF JUDGE OF THE UNITED STATES COURT
OF APPEALS FOR THE TENTH CIRCUIT, sitting by
designation pursuant to 28 U.S.C. § 291(b).